**Robert L. ACREE et al., Plaintiffs,**

v.

**COUNTY BOARD OF EDUCATION OF RICHMOND COUNTY, GEORGIA et al., Defendants.**

**Civ. A. No. 1179.**

United States District Court
S. D. Georgia,
Augusta Division.

Dec. 26, 1968.

John H. Ruffin, Jr., Augusta, Ga., for plaintiffs.

Franklin H. Pierce, Augusta, Ga., for defendants.

## ORDER OF COURT

LAWRENCE, District Judge.

This case has been around since June, 1964. A review of its past history is not amiss.

The complaint was filed as a class action to enjoin the County Board of Education of Richmond County from operating a compulsory bi-racial school system. A fully segregated system was in existence prior to that time. In the Fall of 1964 Judge Scarlett approved a plan of desegregation for the current school year. It involved only the first three grades. He denied the preliminary injunction. An appeal to the Fifth Circuit was dismissed after the defendant Board provided for desegregation of grades 4, 5, 6 and 12. An off-shoot issue of the main case was an appeal in 1965 from the alleged refusal of the defendants to allow a Negro student to take a summer course in Algebra at Richmond Academy, a white school. On June 30, 1965 the Fifth Circuit Court of Appeals reversed this Court and granted the applicant the relief she sought.

Following the 1967 decision of the Fifth Circuit in United States et al. v. Jefferson County Board of Education, 380 F.2d 385, plaintiffs moved for summary judgment and for further relief with particular reference to the require-ments laid down as to free choice plans. By orders dated August 17 and 18, 1967 Judge Scarlett, after a hearing, over-ruled the two motions, stating that a freedom of choice plan had been adopted and that it was impracticable, under the circumstances, to determine its effect upon desegregation in the school year 1967–'68.

Again there was an appeal and on September 22, 1967 the Fifth Circuit granted a motion for summary reversal. It ordered a decree entered in conformity with *Jefferson County Board of Education.* It reserved judgment as to whether the freedom of choice plan then in effect in Richmond County might have to be abandoned in order to achieve a non-racial, unitary system. In accordance, Judge Scarlett on October 12, 1967 rendered a decree permanently enjoining defendants from racial discrimination and requiring affirmative action by the Board consistent with the free choice requirements of *Jefferson.*

In March, 1968 plaintiffs filed a motion for an order adjudging defendants in contempt for violation of the Jefferson-type decree. An evidentiary hearing was held on April 22, 1968. It was carried over to May 17th when additional evidence was heard. The Court required certain information to be furnished by defendants. In summary it showed in respect to desegregation in the Richmond County School system that there were 670 Negro students in white schools and 336 white students in Negro schools. The number of Negro teachers in white schools was 20 and the number of white teachers in colored schools was 33. The number of Negro staff members in white schools was 4 and white staff members in Negro schools was 2.

The total enrollment of white and colored children in 1967–'68 was approximately 35,750 students. Of 12,250 Negro students in the school population 5.5% chose to attend previously all-white schools. With one exception no white student had exercised freedom of choice to attend a previously all-Negro school.

On May 22, 1968 plaintiffs moved for summary judgment on the pleadings and evidence, including the report referred to above. A few days dater the U. S. Supreme Court handed down the trio of opinions dealing with freedom of choice in the cases of County School Board of New Kent County (Va.), Gould School District (Ark.) and Board of Commissioners of the City of Jackson (Tenn.), 391 U.S. 430–460, 88 S.Ct. 1689, 20 L.Ed. 716, 88 S.Ct. 1697, 20 L.Ed.2d 727, 88 S.Ct. 1700, 20 L.Ed.2d 733.

Judge Scarlett overruled the motion to hold defendants in contempt and likewise denied the motion for summary judgment. An appeal was taken and on July 18, 1968 the Fifth Circuit reversed. See 399 F.2d 151. In pointing out reasons for not issuing an original injunctive decree, it stated:

"In denying the relief requested, however, we think it quite appropriate to point to the fact on the undisputed statistics presented to us it is clear that, with respect to the Richmond County Board of Education, a plan of desegregating the schools, generally known as 'the freedom of choice' plan, has not worked. It has not produced a unitary school system in which there are no longer Negro schools and white schools, generally known and recognized by all as such. Under these circumstances, it becomes the duty of the respondent Board, not only under the Supreme Court decisions above referred to, but under our Jefferson decree, to take additional important and effective steps."

The Court went on to say:

"We think it not necessary to do more than call the attention of the respondent here to the extremely important obligation which is once more placed on the Board to assume its full responsibility to do all that is reasonably feasible, and *now*, to bring an end to the dual system of white and Negro schools in Richmond County."

On July 26, 1968 plaintiffs moved for an order requiring the School Board to submit a new plan in the light of the decision by the Circuit Court of Appeals. Shortly thereafter, defendants filed a report to the District Court stating in part:

"It is submitted that the freedom of choice plan be continued for the year 1968–'69 for the reasons set forth * * *. It is respectively submitted that the defendants be allowed to establish a zone plan to become effective with the opening of school in September, 1969, and to that end the defendants propose to present such a plan to the Court, and plaintiffs, within 60 days. This will allow ample opportunity for the hearing necessary to gain approval of whatever zoning plan will be in effect in September, 1969."

The matter had been assigned for hearing at Brunswick before Judge Scarlett on November 15, 1968. During the early part of that month the litigation was transferred to me as Chief Judge of the Southern District. A hearing relating to the pending motions was held at Augusta on December 17, 1968.

The case centers around plaintiffs' motion to require the Board to present a new plan with unitary, non-racial zones or "pairing." The effective date urged for such a plan was the 1968–'69 school year. Because of delay the target date has now become the second semester of the present school year, that is about February 1, 1969.

The School Board never presented any zone plan as it originally proposed to do. At the hearing on December 17, 1968 defendants proposed two possible procedures:

(1) "to draw zones so that all pupils living within that zone would be required to attend the school located within the zone".

(2) "to continue our Freedom of Choice Plan with certain adjustments which could be made through our extensive building program, which is now underway, and changes in transportation patterns in such manner as to encourage a greater amount of integration".

The Board pointed out that when the present building program is completed, there will be sufficient space in several of the new educational centers to bring about a greater number of pupils on an integrated basis and that the new schools will make it possible to change existing transportation patterns so as to encourage a larger degree of integration. It takes the position that the zoning plan is the least desirable of the two alternatives.[1]

■ At the conclusion of the hearing in Augusta I made certain tentative rulings. They were that the present freedom of choice system is impermissible and that a geographical attendance zoning plan should be put into effect. I stated that the new plan would become effective with the start of the 1969-'70 school year and not the February 1, 1969 date urged by plaintiffs. The testimony of Superintendent Roy E. Rollins was that it was impracticable to make such a plan effective during the present school year. I made it plain that the new plan will become operative at the start of school next September and that no further delay would be permitted in the effort to eliminate the present dual system. I adhere to my informal rulings in these respects.

The evidence presented at the recent hearing was mainly directed at bringing up-to-date the record in the hearing held by Judge Scarlett in the Spring of 1968. It showed that the segregation situation remains, by and large, the same during the present school year as in the last. The testimony at the hearing on December 17th revealed only minor-key variations in the dualistic chord. An up-dating of the April, 1968 summary and a comparison shows:

|  | 1967-'68 | 1968-'69 |
|---|---|---|
| Number of Negroes in Predominantly White Schools | 670 | 904 |
| Number of Whites in Predominantly Negro Schools | 336 [2] | 45 |
| Number of Negro Teachers and Staff Members in White Schools | 24 | 34 |
| Number of White Teachers and Staff Members in Negro Schools | 35 | 25 |

A degree of progress has been achieved in the integration of formerly all-white schools. In 1965-'66 the percentage of total Negro students attending schools across racial lines was 0.5; in 1966-'67, it was approximately 2.5%; in 1967-'68 around 5.5%, and in 1968-'69 it rose to about 6.7%. In Houghton Elementary School which is located in the downtown area of Augusta a high degree of integration exists—246 colored pupils out of a total enrollment of 555. However, there are no white students in 16 Negro schools and there are no colored students in 7 white schools. At this time, the percentage of whites in predominantly Negro schools is only two-tenths of 1% of the total enrollment of white students in all schools.

Conceding that they are required to achieve a unitary, non-racial school system, defendants contend that in good

1. In view of the fact that there are ten new schools in the building program, some of which will not open until September, 1970 difficulties will be encountered in establishing a zone system. However, I feel that the problem is capable of reasonable solution.

2. This figure is illusory as it includes a considerable number of whites who were temporarily enrolled at the White Road Branch of the Augusta Technical School in connection with a 12-week course sponsored by Augusta industries. The 1968-'69 total is representative.

faith they have put such a plan in effect. I do not question the *bona fides* of the Board but the Court above has held in this case that the freedom of choice plan, which Judge Scarlett approved on October 12, 1967 has not produced results satisfactory to the Fourteenth Amendment and to that tribunal. The choice plan under which the Richmond County Schools are now being operated possesses no real prospect for dismantlement of the dual system at any early date and the Supreme Court has said that freedom of choice must be an effective device promising "meaningful and immediate progress toward disestablishing state-imposed segregation." Green v. County School Board of New Kent County, 391 U.S. 430, at 439, 88 S.Ct. 1689, at 1695, 20 L.Ed.2d 716, at 724.

On the other hand, the *New Kent* decision does not completely interdict freedom to choose between a white or a Negro school. "Freedom of Choice" remains an available instrument of desegregation if it contributes to the achievement of a unitary system. As the highest Court said in that case (ibid., 440, 88 S.Ct. 1695), "there may well be instances in which it can serve as an effective device."

At the hearing I raised the question of whether attendance zones and choice are so mutually exclusive as to be incapable of co-existence. In *Monroe* the highest Court (391 U.S. 458f, 88 S.Ct. 1700, 20 L.Ed.2d 733) pointed out that the "free-transfer" option permitted many students in two attendance zones "to return, at the implicit invitation of the Board, to the comfortable security of the old, established discriminatory pattern."

While no student has a constitutional right to attend a school of his own choice (Jefferson, 380 F.2d at 390; Davis v. Board of School Commissioners of Mobile County, 5 Cir., 393 F.2d 690) the free choice of attending comparable schools is something which should not be obliterated (and I do not intend to do so) in one Olympian judicial gesture. Chaos is as much to be avoided as strict legality to be sought. Accordingly, I will give consideration to a plan formulated by the Board which combines automatic assignment of pupils within designated geographical zones and a limited freedom of choice of schools. It seems to me to be reasonable to try out such a plan during the next school year. If it does not produce required results and does not eliminate the present inescapable inference of racial discrimination, the Board will have to head out in some other direction in 1970–'71 (or perhaps at the second semester next year).

Zones must, of course, be drawn without an eye to racial consequence except to promote desegregation and not to perpetuate segregation.[3] Zoning will be of primary significance in any new plan presented by the Board.

Attention is called to Stell v. Board of Education for the City of Savannah and Chatham County, 5 Cir., 387 F.2d 486 (1967). There the Court of Appeals for this Circuit ordered desegregation according to a plan of its own which combined (a) attendance zones (consistent with the unitary goal and proper operation of the school system as a whole) and (b) annual exercise of choice. This was agreed to by stipulation of the parties and Judge Scarlett approved the plan on November 6, 1968.[4]

---

3. In the hearing at Brunswick on May 17, 1968, an official of HEW testified that at one point a zone arrangement was presented for Richmond County which was "purely a racially zoned plan." (tr. p. 87.)

4. Styled a "freedom of choice attendance zone plan," it provides that "no student shall attend a school outside the attendance zone in which he resides unless there is no space available in his grade at any school within his attendance area." It should be borne in mind that in Davis v. Board of School Commissioners of Mobile County, 5 Cir., 393 F.2d 690 the Court said that "once attendance zones have been properly designated, the student's option to attend the nearest formerly white

Chatham County and Richmond County are fairly comparable as to racial population, school census, number of schools, and racially mixed residential areas. The total public school enrollment in Chatham is around 42,500. The students are enrolled in 61 schools of which 32 are predominantly white and 29 are Negro. A report filed by the Chatham County Board in September, 1968 may be of interest. It shows:

Number of Negro Students in Predominantly White Schools .... 1620
Number of White Students in Predominantly Negro Schools .... 589
Number of Negro Teachers in White Schools ................. 113
Number of White Teachers in Negro Schools ................. 44

——◆——

I have pointed out the necessity of prompt Board action in view of the fact that the 1969–'70 school year will be the effective date of the new plan in Richmond County. As the Supreme Court said in *New Kent*, "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*."

Superintendent Rollins has referred in an affidavit to the difficulties involved in getting qualified white teachers to teach in predominantly Negro schools and vice versa. He says, "Both Negro and white teachers are used to a system of segregation, and it is difficult to persuade them of the advantages of integration." In this connection I can only repeat these words of Chief Judge Brown of the Court of Appeals for the Fifth Circuit in Jefferson II, 396 F.2d 44, 50: "Obviously, the fulfillment of the Constitution cannot rest on the willingness of people to abide. The School Boards do not meet their duty by soliciting volunteers for the fact remains that the responsibility for faculty desegregation, just as the 'responsibility of student desegregation, lies ultimately with the board, not the teachers'."

I am well aware of the difficulties and problems that will both precede and succeed the restructuring of the existing segregative system of public schools in Richmond County. I am equally aware that on August 8, 1968 the defendants recommended that this Court authorize or direct it "to begin as promptly as possible the setting up of school zones in such manner as to reflect a more favorable integration percentage, to become effective with the opening of school in September, 1969."

That in substance is precisely what I have ruled today.

In formulating a new plan the defendants will try to meet the following time schedule:

March 1, 1969. Filing of a progress report in connection with the presentation of the proposed plan.

April 1, 1969. Presentation of proposed attendance zones or areas (along with criteria), taking into effect the changes in zones that will necessarily accompany the completion of certain new schools by the 1970 school year.

May 1, 1969. Presentation to the Court of the proposed plan covering the school years 1969–'70 and 1970–'71. The plan will be in line with the directions and rulings in this Order.

June 1, 1969. Approval by the Court of a new plan for desegregation of the Richmond County schools.

It is so ordered.

or formerly Negro school outside his zone must be eliminated." Ibid., 694. In each attendance area in Chatham County there are two choices possible of a school.